581 P.2d 1148

PAYSON SANITARY DISTRICT OF GILA COUNTY, a Governmental Agency of the State of Arizona, Edward T. Glascock, Jr., Chairman, David B. Gilbert, Secretary, Frank D. Manthe, D. W. Thompson and Granville Wilson, Individually and as Members of the Board of Directors of Payson Sanitary District of Gila County, Appellants,

v.

Gerhard ZIMMERMAN and Gail Zimmerman, his wife, Payson East, a limited partnership, and William Rosenbower and Tonto Land and Investment Co., a partnership, d/b/a Park Payson Pines, Appellees.

No. 2 CA–CIV 2287.

Court of Appeals of Arizona, Division 2.

April 12, 1978.

Thomas L. Wing, Payson, Burch, Cracchiolo, Levie, Guyer & Weyl, P.A. by Frank Haze Burch and Arda S. Rutherford, Phoenix, for appellants.

A. Alexander Katz, Phoenix, for appellees.

OPINION

HATHAWAY, Judge.

Appellees brought this action for declaratory relief, specific performance, injunctive

relief and damages to prevent appellants from enforcing a $400 per lot charge for lots not previously within the sanitary district, connecting for the first time to district trunk lines. This appeal is from a judgment granted upon appellees' motion for summary judgment, holding, among other things, that there was no statutory authority for the charge. Appellants also appeal from the form of the judgment insofar as it orders acceptance of all requests for sewer connections from all interested parties upon payment of the $50 fee. Appellants will for convenience be referred to on occasion as the District.

Five questions are presented for review. The key question challenges the District's authority to impose the charge. We will first set forth the basic undisputed facts.

Appellant Payson Sanitary District is a governmental agency organized under title 36, chapter 11 of Arizona Revised Statutes for the purpose of operating a sewerage system within its territory. ·Appellee Payson East is the developer of Ridgeway Estates, a subdivision in Payson, Arizona, consisting of 56 lots. Appellee Park Payson Pines is the developer of Park Payson Pines, a subdivision in Payson consisting of 77 lots. Appellees Zimmerman purchased a lot in Ridgeway Estates. The final plat of

Ridgeway Estates was approved by the Board of Supervisors of Gila County on October 15, 1971, and the final plat of Park Payson Pines was approved on May 10, 1972.

On October 4, 1972, the District granted Park Payson Pines and Ridgeway Estates permission to connect to and become a part of the Payson Sanitary District sewer system. This was accomplished by completing forms supplied by the Arizona State Department of Health. These documents served as assurance to the Arizona State Department of Health of the availability of sanitary facilities for the subdivisions by the district indicating approval of plans and specifications pertaining to the subdivision sewer systems and agreeing to inspect the proposed sewer system during construction and to maintain and operate them upon completion.[1]

A certificate of approval of sanitary facilities for Park Payson Pines was issued by the Arizona State Department of Health on November 29, 1972, and for Ridgeway Estates on June 20, 1973. At the time, Sec. 8(d) of the Payson Sanitary Code provided in part:

"In new subdivisions or plats where the subdivider or developer has made the

1.  "ARIZONA STATE DEPARTMENT OF HEALTH
Bureau of Environmental Health
Phoenix, Arizona  85007

TO BE FILLED OUT AND SIGNED, WHERE APPROPRIATE, AND SUBMITTED WITH APPLICATION SEWER SERVICE AGREEMENT ---- Plans and specifications for sewer extensions to serve the PARK PAYSON PINES have been reviewed and approved and
(Name of Subdivision)
permission is hereby granted for the proposed sewer system to connect to and become a part of the PAYSON SANITARY [sic] DIST
(Name of Sewer System)
We hereby agree to inspect the proposed sewer system during construction and will maintain and operate the system upon its completion.

Date 10/4/72

Signed    E. T. Glascock, Jr.
Title     Chairman
Address   Box 859
City      Payson, Ariz.

"EXHIBIT "A"

sewer installation, there will be a connecting fee charge of Fifty Dollars ($50.00) for each residential lot . . ."

On January 22, 1973, the District adopted Resolution No. 76 which authorizes the charge in question:

### "RESOLUTION NO. 76
### RELATING TO SANITARY SEWER SERVICE IN AREAS UNDER DEVELOPMENT

Be it resolved that the Board of Directors of the Payson Sanitary District, Gila County, Arizona, amend Section Nine (9) of the Sanitary District Code in order to set forth the terms and conditions of providing sewer service to new subdivisions, business, industrial or development lots; and outline annexation procedures and set forth fees to be charged each of the above.

1. For service of residential subdivisions, on payment of an amount computed at FOUR HUNDRED AND NO/100 ($400.00) DOLLARS, Minus original cash assessment if applicable, per residential lot.

   *    *    *    *    *    *

8. If property for which application for sewer service is made, is not presently within the boundaries of the Sanitary District, a petition in proper form for annexation of said property to the Sanitary District shall be filed with said service application. Such petition to be signed by a majority of the persons owning said property or by the owners of fifty-one percent (51%) or more of said property as required by law.

9. All monies received by the Sanitary District pursuant to any of the terms and conditions set forth above shall be expended for *bond redemption and the extension of Sanitary District lines and other Sanitary District facilities.*

10. Except as provided herein, the rules and regulations governing connections to Sanitary District Sewer lines adopted as the Payson Sanitary District Code, August thirtieth (30)

1971, as amended, shall continue in full force and effect.

PASSED and ADOPTED the twenty-second (22nd) day of January, 1973, by the Board of Directors of the Payson Sanitary District." (Emphasis added)

Resolution No. 76 was drafted by laymen and it has been pointed out that in practice the term subdivision as used in the ordinance includes "land splits", as defined in A.R.S. Sec. 9–463(3), within the original boundaries of the district. In such case the property owner would have already paid annual taxes to retire Sanitary District bonds for one parcel and would be entitled to an exemption for one lot.

The District had constructed a sewer plant pursuant to a $200,000.00 bond issue. Thereafter, it constructed main lines pursuant to another bond issue of $1,175,000.00. A.R.S. Sec. 36–1313 provides that main lines are to be funded through bonding and lateral and collecting lines are to be paid for by the connecting property owners. Laterals, other than appellees', were installed by three improvement districts all within the boundaries of the sanitary district. The improvement districts assessed the lot owners $480 for each lot. The lateral lines in appellees' subdivisions were not built by any improvement district, but by appellees, at their own cost, for approximately $1,000 per lot.

Appellees ask, what then is the purpose of the $400 charge? Appellants respond that the charge is for additional demand on the capacity of the sewer system and for the benefit afforded appellees through access into the system appellants have made available, which includes not only a sewer plant and trunk lines, but also an integrated sewer system produced and paid for over the years by the District in its capital improvements, engineering, management, accounting, legal and other numerous functions.

■ Sanitary districts are creatures of statute, deriving their existence and powers from title 36, ch. 11, A.R.S. Sec. 36–1301, et seq. Upon establishment " . . . the

district shall be a body corporate with the powers of a municipal corporation for the purposes of carrying out the provisions of this article." A.R.S. Sec. 36–1305(A). The right of a municipal corporation to regulate and control the use of its sewers has been generally recognized as a necessary incident of its ownership and it may permit appropriate use to be made of its sewers subject to reasonable conditions. 64 C.J.S. Municipal Corporations § 1805a. Beyond its incidental authority, the District has established rules and regulations governing connections and permits therefor as authorized in A.R.S. Sec. 36–1310.10 and .11.[2] Statutory authority is found authorizing receipt and expenditure of funds in A.R.S. Sec. 36–1310.3.[3]

A sanitary district is under no obligation to furnish service outside its boundaries and it may offer its services, within the scope of its authority, on whatever terms it deems suitable. *City of Phoenix v. Kasun*, 54 Ariz. 470, 97 P.2d 210 (1939). Its relationship to subscribers beyond its limits arises only through contract and the reasonableness or unreasonableness of its charges for access to its system is not subject to judicial review. *City of Phoenix v. Kasun*, supra. In *Atlantic Const. Co. v. City of Raleigh*, 230 N.C. 365, 53 S.E.2d 165 (1949), the North Carolina Supreme Court upheld a sewerage connection fee imposed on subdivisions outside the city limits. The city had entered into a contract with developers whereby the city was to accept the subdivisions' local sewer system and permit its connection to the city's system. The court upheld the subsequent enactment and enforcement of an additional connection fee pertaining only to properties outside the city limits. The court noted that the relationship between the parties was contractual, citing *City of Phoenix v. Kasun*, supra, and observed that the city could not compel residents living outside its corporate limits to avail themselves of its services, nor could such resident, in the absence of contract, compel the furnishing of such services. The court held the plaintiff had no standing to challenge the validity of the connection fee and stated:

> ". . . since it is optional with a city as to whether or not it will furnish water to residents outside its corporate limits and permit such residents to connect their sewer facilities with the sewerage system of the city . . . it may fix the terms upon which the service may be rendered and its facilities used." (Citations omitted) 53 S.E.2d at 168.

Likewise, the relationship, if any, between the parties to the case at bench arises through contract, which brings us to the next question we consider on this appeal.

Appellants contend that the trial court erred in holding as a matter of law that when a sanitary district assures the Arizona State Department of Health that it will permit certain developers to connect to its sewer lines on state forms, which do not specify a time limit, that a contract for connection under the same terms exists several years later. They contend that the period at best expires with the term of the

---

2. "Sec. 36–1310. Powers of sanitary district
In addition to the powers specifically granted, a sanitary district, acting through its board of directors may:
   \*     \*     \*     \*     \*     \*
   10. Formulate and adopt rules and regulations governing connections to the sewer lines of the district and governing connections without the limits of an incorporated city or town to sewer lines which connect to sewer lines of the district.
   11. Require permits for any and all connections described by paragraph 10."

3. "3. Acquire in the name of the district any real or personal property or interest therein by gift, purchase, condemnation or otherwise, and own, control, manage or dispose of such property or interest when necessary or convenient for the purposes stated in paragraphs 1 and 2. Private funds or contributions received by a sanitary district for the purpose of defraying expenses of work done under its direction may be expended by the district in compliance with the terms and conditions under which such funds are received, provided the terms and conditions meet the approval of the board of directors of the district and are within the scope of the statutory powers and duties of the district."

**502**

Arizona State Department of Health certificate, since the District knows when it gives permission for a subdivision to connect to its sanitary facility that if the work is not begun within one year, the subdivider will have to reapply for certification of sanitary facilities. Thus, the District argues, it is made constantly aware of its obligation for the ensuing year and can plan accordingly. Appellees respond that once the District's assurance is given, it remains until the District is dissolved.

 To prevail on their motion for summary judgment, appellees were required to establish the undisputed existence of a valid contract and to further

> " . . . show that there is no genuine dispute as to any material fact and that only one inference can be drawn from those undisputed material facts; and (2) that based on the undisputed material facts the moving party is entitled to a judgment as a matter of law." *Choisser v. State ex rel. Herman,* 12 Ariz.App. 259, 261, 469 P.2d 493, 495 (1970).

The differences between the parties' positions on the duration of the District's commitment, vividly points up a fundamental fact dispute. The District contends that it should not be bound to permit sewer connections three or more years after the assurance merely upon payment of the fees in force at the time of the original inquiry. Such an interpretation, it submits, would give subdividers the opportunity to guarantee future delivery at the present price, regardless of time lag or inflationary spiral, a result not intended by the parties. The intent of the parties, of course, controls. *Chu v. Ronstadt,* 17 Ariz.App. 486, 498 P.2d 560 (1972). The burden of proving the contract lies with the appellees, the parties asserting it, and they must prove each fact essential to it. *Alexander v. O'Neil,* 77 Ariz. 91, 267 P.2d 730 (1954).

Inasmuch as appellants are willing to furnish service to appellees pursuant to the fees and conditions existing at the time their request to connect was made, the factual dispute between the parties as to the duration of the District's commitment is immaterial. Since nothing in appellants' commitment binds them to furnish service to appellees for the fees prevailing at the time the assurance was given, appellants' cross-motion for summary judgment should have been granted.

In view of our holding, consideration of the other questions presented is unnecessary.

Reversed with instructions to enter judgment for appellants.

RICHMOND, C. J., and HOWARD, J., concur.