SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| FIRST AMERICAN TITLE INSURANCE COMPANY, a California corporation, | ) Arizona Supreme Court<br>) No. CV-07-0412-PR<br>)<br>) Court of Appeals |
| Plaintiff/Counter-<br>Defendant/Appellee, | ) Division One<br>) No. 1 CA-CV 06-0782<br>) |
| v. | )<br>) Maricopa County |
| ACTION ACQUISITIONS, LLC, an Arizona limited liability company; FREE FOR NOW, LLC, an Arizona limited liability company, | ) Superior Court<br>) No. CV2006-050519<br>)<br>)<br>) |
| | ) **O P I N I O N** |
| Defendants/Counter-<br>Claimants/Appellants. | )<br>) |
| _____ | )<br>) |
| ACTION ACQUISITIONS, LLC, an Arizona limited liability company; FREE FOR NOW, LLC, an Arizona limited liability company, | )<br>)<br>)<br>)<br>)<br>) |
| Third-Party<br>Plaintiffs/Appellants, | )<br>)<br>) |
| v. | )<br>) |
| CAPITAL TITLE AGENCY, INC., an Arizona corporation, | )<br>)<br>) |
| Third-Party Defendant/Appellee. | )<br>) |
| _____ | ) |

Appeal from the Superior Court in Maricopa County
The Honorable Paul A. Katz, Judge

**AFFIRMED**
_____

Opinion of the Court of Appeals, Division One
216 Ariz. 537, 169 P.3d 127 (App. 2007)

**VACATED**
_____

RAMRAS LAW OFFICES, P.C.                                    Phoenix
    By   David N. Ramras
       Ari Ramras
Attorneys for First American Title Insurance Company

BERENS, KOZUB & KLOBERDANZ, P.L.C.                          Scottsdale
    By   Daniel L. Kloberdanz
       William A. Kozub
Attorneys for Action Acquisitions, LLC and
Free For Now, LLC

JACKSON WHITE, P.C.                                         Mesa
    By   Eric M. Jackson
       Christine Farnsworth
Attorneys for Capital Title Agency, Inc.
_____

**B A L E S**, Justice

¶1    This case involves title insurance for a home purchased at a sheriff's sale. After the purchasers obtained the insurance policy, the superior court set aside the sale because the purchasers had paid a grossly inadequate price. The purchasers then made a claim for insurance coverage. We hold that the title insurer properly denied coverage based on the policy's exclusion for loss resulting from risks created by the purchasers.

## FACTS AND PROCEDURAL BACKGROUND

¶2    At a sheriff's sale in early 2005, the purchasers - Action Acquisitions, LLC and Free for Now, LLC - successfully bid $3,500 for a home in Gilbert. The sale occurred because a homeowner's association had foreclosed on the home to collect

about $3,000 in unpaid assessments.  The property was worth between $300,000 and $400,000 and subject to a $162,000 deed of trust.  The purchasers, who were in the business of buying and selling homes for profit, thus stood to gain more than $130,000 if they resold the home at market value.

¶3      After the six-month redemption period, the purchasers bought from Capital Title Agency a $400,000 owner's title insurance policy issued by First American Title Insurance Company.  The purchasers allege that, before the policy issued, Capital Title investigated the underlying foreclosure to confirm there had been no procedural errors, and that it knew the purchasers had paid only $3,500.  They also allege that they accepted Capital Title's recommendation to buy a premium policy instead of a basic policy.  The policy they purchased – as did the basic policy – excluded coverage for certain losses, including those resulting from the insured's "failure to pay value for [the] Title" (Exclusion 5) or from risks "created" by the insured (Exclusion 4.a).

¶4      The prior homeowner successfully moved to set aside the sheriff's sale on the ground that the $3,500 price was grossly inadequate.  *See Nussbaumer v. Superior Court*, 107 Ariz. 504, 507, 489 P.2d 843, 846 (1971) (recognizing court's equitable power to set aside foreclosure sale for grossly inadequate price).  The purchasers did not appeal the superior

3

court's judgment setting aside the sale. Instead, they made a claim against the title insurance policy. First American sought a declaratory judgment that it was not liable; the purchasers brought a counterclaim and a claim against Capital Title. First American and Capital Title moved for summary judgment, which the superior court granted. It found that coverage was properly denied under the "created" risk exclusion. It did not address the "failure to pay value" exclusion.

¶5    The court of appeals affirmed; it relied on the "failure to pay value" exclusion and did not address the "created" risk exclusion. *First Am. Title Ins. Co. v. Action Acquisitions, LLC*, 216 Ariz. 537, 539-40 ¶ 8, 169 P.3d 127, 129-30 (App. 2007). The court stated that Arizona courts no longer construe insurance contract ambiguities against the drafter, but instead look to the purpose of the exclusion, public policy, and the transaction as a whole. *Id.* at 540 ¶ 9, 169 P.3d at 130. Considering these factors, the court concluded that the "failure to pay value" exclusion applies if the insured is not a bona fide purchaser for value under the recording statutes and that a purchaser whose sale is set aside for a grossly inadequate price is not a bona fide purchaser. *Id.* at 540-41 ¶¶ 12-13, 169 P.3d at 130-31. The court further held that the purchasers had no reasonable expectation of insurance coverage. *Id.* at 542 ¶ 19, 169 P.3d at 132.

4

¶6      This case presents important, recurring issues. We granted review and have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24 (2003).

**ANALYSIS**

¶7      To resolve this case, we must consider the scope of the policy exclusions for "failure to pay value" and for risks "created" by the insured and whether the purchasers here had a reasonable expectation of coverage.

**I.**

¶8      We review de novo the interpretation of insurance contracts. *Sparks v. Republic Nat'l Life Ins. Co.*, 132 Ariz. 529, 534, 647 P.2d 1127, 1132 (1982). If a clause appears ambiguous, we interpret it by looking to legislative goals, social policy, and the transaction as a whole. *Employers Mut. Cas. Co. v. DGG & CAR, Inc.*, 218 Ariz. 262, 264 ¶ 9, 183 P.3d 513, 515 (2008). If an ambiguity remains after considering these factors, we construe it against the insurer. *Id.* The court of appeals erred in saying that we have "abandoned" the rule that ambiguities are construed against the insurer. That rule remains; we simply do not resort to it unless other interpretive guides fail to elucidate a clause's meaning. *See Transamerica Ins. Group v. Meere*, 143 Ariz. 351, 355, 694 P.2d 181, 185 (1984).

5

¶9      The policy excludes coverage for loss resulting from the insured's "failure to pay value for [the] Title."  The purchasers argue that if "value" is given its "plain meaning," the exclusion does not apply, because they paid $3,500 for property that was subject to both a $162,000 first mortgage and a statutory right to redeem the foreclosure.  Alternatively, the purchasers argue that the word "value" has various meanings and the court of appeals erred in equating the term as used in the exclusion with the "valuable consideration" required for a purchaser to be protected by the recording statutes.

¶10     We agree with the purchasers that the word "value," when considered alone, is somewhat unclear.  But this conclusion merely indicates that we need to consider whether other factors will clarify the meaning of the exclusion.  We have not identified any pertinent legislative goals or social policies regarding this interpretive issue.  We find guidance, however, in the transaction as a whole, including both the general nature of title insurance and the provisions of this policy.

¶11     Title insurance generally is an insurer's agreement to insure against losses caused by claims against the insured's title to real property, unless a title search identifies the risk of those claims or an exclusion applies.  Quintin

Johnstone, *Title Insurance*, 66 Yale L.J. 492, 492-95 (1957). Before issuing a policy, an insurer will review the public records to identify defects or encumbrances. D. Barlow Burke, *Law of Title Insurance* § 1.01 (2000 & Supp. 2007). The insurer typically will exclude from its coverage a list of "exceptions" reflecting these risks. Joyce Palomar, *Palomar and Patton on Land Titles* § 41 (3d ed. 2003 & Supp. 2007). Apart from such scheduled exceptions, title insurers will include standard exclusions, like those at issue in this case.

¶12 Title insurance exists against the backdrop of the recording statutes. Under those laws, unrecorded interests are invalid against creditors and against subsequent purchasers for "valuable consideration" who lack notice of the interest. A.R.S. § 33-412(A) (2007). Conversely, unrecorded instruments are valid "as to all subsequent purchasers with notice thereof, or without valuable consideration." A.R.S. § 33-412(B). The term "bona fide purchaser" is often used to refer to one who purchases property for value and without notice. *See, e.g.*, *Davis v. Kleindienst*, 64 Ariz. 251, 258, 169 P.2d 78, 82 (1946).

¶13 This background informs our interpretation of the "failure to pay value" exclusion. How can a purchaser's failure to pay value for the title result in a loss? This loss can obviously occur if an insured lacking recording act protection faces a title challenge from a prior unrecorded interest. The

7

recording statutes generally protect bona fide purchasers from unrecorded interests in land, but such interests are valid and binding as to a purchaser who does not pay valuable consideration or who has notice.

¶14        The circumstances in which a purchaser will not be protected by the recording statutes have evident counterparts in the policy exclusions.  Exclusion 5 excludes coverage for losses that result from the purchaser's "failure to pay value" for the title; Exclusion 4.b applies to unrecorded risks that are known to the purchaser but not the insurer.

¶15        Given the policy language and the nature of title insurance, the exclusion for "failure to pay value" is most reasonably understood as applying when an insured is not a bona fide purchaser protected by the recording statutes.  Although we have not found decisions in other jurisdictions addressing this issue, our conclusion comports with the views of commentators. *See* Joyce Palomar, *Title Insurance Law* § 6.25 (2007); Roger Bernhardt, *Teaching Property Law as Real Estate Lawyering*, 23 Pepp. L. Rev. 1099, 1209 (1996).

¶16        Thus, we agree with the court of appeals that the policy's exclusion for loss resulting from the insured's "failure to pay value" for the title means a loss resulting because the insured has not paid "valuable consideration" and therefore is not protected under the recording statutes.

¶17     The purchasers contend that even if the exclusion applies when an insured does not pay valuable consideration, their $3,500 payment constitutes such consideration. We agree.

¶18     To pay valuable consideration under the recording statutes, a purchaser must give a "present equivalent" for the title. *Alexander v. O'Neil*, 77 Ariz. 91, 96, 267 P.2d 730, 733 (1954). "Present equivalent" has an expansive meaning. It does not require the purchaser to pay fair market value or even a price that might be characterized as fair or adequate. Instead, the required "valuable consideration" or "present equivalent" exists if the purchaser surrenders a right or detrimentally changes a legal position "so that if the claim of title fails the purchaser is left in a worse position than he was before." *Id.* at 99, 267 P.2d at 735; *see* 2 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 747 (4th ed. 1918).

¶19     "Valuable consideration" is required under the recording statutes to distinguish transactions in which the purchaser has surrendered a significant right or incurred some legal detriment from transactions in which a person takes title as a "volunteer" (for example, by gift or devise). *Alexander*, 77 Ariz. at 99, 267 P.2d at 735; Pomeroy, *supra*, at § 747. Thus, a nominal payment is not valuable consideration because it demonstrates that no purchase ever occurred. For example, when

an elderly father "sold" property to his daughter for $10, the low price demonstrated that the "sale" was really a gift. *Ten Eyck v. Whitbeck*, 31 N.E. 994, 997 (N.Y. 1892).

¶20    Here, the $3,500 was valuable consideration because, although it was a bargain price, the purchasers surrendered the right to money of more than a nominal amount. Furthermore, there is little danger of bad faith because they purchased the property at arm's length at a sheriff's sale, not from a friend or relative who might charge a minimal amount in an effort to characterize a gift as a purchase.

¶21    First American and Capital Title nonetheless urge us to hold, as did the court of appeals, that one whose purchase is later set aside for a grossly inadequate price has, by definition, not paid valuable consideration. At least one other court has adopted this analysis. *See Phillips v. Latham*, 523 S.W.2d 19, 24 (Tex. Civ. App. 1975). We find this argument unpersuasive in light of our decision in *Krohn v. Sweetheart Props., Ltd.*, 203 Ariz. 205, 52 P.3d 774 (2002).

¶22    In *Krohn*, we held that a trustee's sale of property under a "deed of trust may be set aside solely on the basis that the bid price was grossly inadequate." *Id.* at 214 ¶ 38, 52 P.3d at 783 (emphasis omitted). In so ruling, we observed that a price of twenty percent or less of fair market value is generally considered a grossly inadequate price. *Id.* at 213

¶ 34, 52 P.3d at 782. The purchaser in *Krohn* had bid slightly more than $10,000 at the trustee's sale for property worth $57,000. *Id.* at 207 ¶ 5, 52 P.3d at 776. We acknowledged that the purchaser was a bona fide purchaser for value, but concluded this status did not insulate the sale from being set aside for a grossly inadequate price. *Id.* at 211 ¶ 24, 52 P.2d at 780; *see also id.* at 214 ¶ 41, 52 P.2d at 783 (McGregor, J., dissenting).

¶23    *Krohn* establishes that one who has paid an amount sufficient to qualify as a bona fide purchaser, that is, one who has paid valuable consideration under the recording statutes, still risks having the sale set aside. There is good reason not to conflate the amount needed to secure recording statute protection with the amount required to prevent a court from equitably setting aside a foreclosure, as they reflect distinct policy concerns. "Valuable consideration" is required for recording act protection because prior transferees holding unrecorded interests are viewed as having a greater claim to the law's protection than subsequent transferees who received their property interest without giving something up in return. *Ten Eyck*, 31 N.E. at 996. In contrast, by using a "grossly inadequate price" to define the court's power to set aside a foreclosure, the law seeks to ensure some substantive fairness for the debtor-owner, who "has absolutely no control over the amount bid." *Nussbaumer*, 107 Ariz. at 507, 489 P.2d at 846.

11

¶24    Accordingly, although the "failure to pay value" exclusion applies if the purchaser's loss is caused by failure to pay valuable consideration under the recording statutes, we hold that the $3,500 payment here was sufficient to secure recording act protection.  The "failure to pay value" exclusion, therefore, does not preclude recovery.

### III.

¶25    The policy also excludes coverage for loss resulting from risks "created, allowed, or agreed to by" the insureds. The purchasers argue that this exclusion is ambiguous and cannot support First American's denial of coverage because Capital Title knew of the $3,500 bid.  First American and Capital Title contend the exclusion applies because the low bid was an intentional, affirmative act by the purchasers.

¶26    Arizona's court of appeals and courts across the country have held that an insured creates a defect or a risk by acting affirmatively to bring it about.  *Ariz. Title Ins. & Trust Co. v. Smith*, 21 Ariz. App. 371, 374, 519 P.2d 860, 863 (1974); *see also* Burke, *supra*, § 4.04[A] (citing cases).  For example, a purchaser can create a defect by buying a property after learning it had been sold to somebody else.  *Stevens v. United Gen. Title Ins. Co.*, 801 A.2d 61, 69 (D.C. 2002).

¶27    The courts disagree, however, about the intent required to trigger the exclusion.  Some hold the insured must

12

merely have intended the act that caused the title defect; others require the insured to have intended the defect itself. *Compare Transamerica Title Ins. Co. v. Alaska Fed. Sav. & Loan*, 833 F.2d 775, 776 (9th Cir. 1987) (applying exclusion when insured had intentionally obtained an equitable lien rather than purchasing the property), *with Laabs v. Chicago Title Ins. Co.*, 241 N.W.2d 434, 439 (Wis. 1976) (finding exclusion inapplicable when insured had intentionally misplaced a fence, but had not intended to create a defect). Some cases even suggest that "intentional misconduct" is required. *E.g.*, *Brown v. St. Paul Title Ins. Corp.*, 634 F.2d 1103, 1107 n.8 (8th Cir. 1980).

¶28    Considering the nature of title insurance, we conclude that the exclusion is not ambiguous and that it applies whenever the insured intended the act causing the defect, not only when the insured intended the defect or when the insured engaged in misconduct. Title insurance principally protects against unknown and unknowable risks caused by third-party conduct, not intentional acts of the policyholder. Otherwise, the insured would be able to use title insurance to make windfall profits. *See Am. Sav. & Loan Ass'n v. Lawyers Title Ins. Corp.*, 793 F.2d 780, 784 (6th Cir. 1986). We also reject the purchasers' proposed rule that the exclusion applies only when the insured's conduct was unknown to the title insurer. That rule would undesirably deny title insurers the power to define the scope of

13

coverage by excluding recognized risks.[1]

¶29    In this case, by bidding $3,500, the purchasers created the risk that resulted in the loss.  Their bid was an intentional, affirmative act that resulted in the sale being set aside.  If the exclusion did not apply, the policy would effectively guarantee the purchasers a windfall profit of possibly more than $200,000, even though they paid only $3,500 and later lost title for paying a grossly inadequate price.  The purchasers would benefit as if they had actually sold the property for market value.  Although insurers and purchasers conceivably could agree to title insurance affording such coverage, it is not consistent with the "created risk" exception, the other policy language, or the general nature of title insurance.

¶30    We accordingly agree with the trial court that the "created" risk exclusion applies.

**IV.**

¶31    The purchasers finally argue that even if one of the exclusions applies, they are entitled to coverage under the reasonable expectations doctrine, as explicated in *Darner Motor*

---

[1]    We also recognize a line of cases beginning with *Hansen v. Western Title Insurance Co.*, 33 Cal. Rptr. 668, 671 (Ct. App. 1963), that have found the exclusion does not apply to defects caused by the insured's negligent acts.  Because the risk in this case resulted from the insured's intentional acts, we need not decide whether to adopt *Hansen*'s rule.

*Sales, Inc. v. Universal Underwriters Insurance Co.*, 140 Ariz. 383, 682 P.2d 388 (1984). Under this doctrine, a contract term is not enforced if one party has reason to believe that the other would not have assented to the contract if it had known of that term. *Id.* at 391-92, 582 P.2d at 396-97 (adopting Restatement (Second) of Contracts § 211 (1981)). In *Darner*, the Court noted that "[t]he rule which we adopt applies to contracts (or parts of contracts) made up of standardized forms which, because of the nature of the enterprise, customers will not be expected to read and over which they have no real power of negotiation." *Darner*, 140 Ariz. at 394, 582 P.2d at 398.

## A.

¶32 First American and Capital Title contend that the reasonable expectations doctrine should not apply here because the policy was negotiated and it was issued to sophisticated business entities that are not within the class of insureds the doctrine is meant to protect. We need not reach these issues, but instead assume for analysis that the doctrine does apply.

## B.

¶33 Terms can frustrate the insured's reasonable expectations in four situations:

> 1. Where the contract terms, although not ambiguous to the court, cannot be understood by the reasonably intelligent consumer who might check on his or her rights, the court will interpret them in light of the

15

> objective, reasonable expectations of the average insured;
>
> 2.  Where the insured did not receive full and adequate notice of the term in question, and the provision is either unusual or unexpected, or one that emasculates apparent coverage;
>
> 3.  Where some activity which can be reasonably attributed to the insurer would create an objective impression of coverage in the mind of a reasonable insured;
>
> 4.  Where some activity reasonably attributable to the insurer has induced a particular insured reasonably to believe that he has coverage, although such coverage is expressly and unambiguously denied by the policy.

*Gordinier v. Aetna Cas. & Sur. Co.*, 154 Ariz. 266, 272-73, 742 P.2d 277, 283-84 (1987) (citations omitted).

**¶34** We reject the purchasers' contention that they had a reasonable expectation of coverage. Their expectations fail each of the four *Gordinier* tests. They fail the first test because a reasonable title insurance holder would not expect protection against loss caused by its own intentional acts. Rather, it would understand that title insurance guards against discoverable risks, as well as a limited number of undiscoverable risks created by others. For the same reason, the "created" risk exclusion could not have been "unusual or unexpected," nor could it have "emasculate[d] apparent coverage," as the second test requires.

16

¶35     The third test presents a closer question.  The purchasers might have subjectively expected coverage based on Capital Title's investigation into the foreclosure, its suggestion that the purchasers buy the premium policy, its knowledge that the purchasers bought the property at a foreclosure sale, and its knowledge that doing so was part of their business.  Ultimately, though, this expectation is simply the "fervent hope usually engendered by loss." *Darner*, 140 Ariz. at 390, 682 P.2d at 395.

¶36     The purchasers never asked if the policy would cover the sale being set aside for a grossly inadequate price and Capital Title never said anything to suggest that it would.  And even though the purchasers might have hoped for coverage of this risk, the insurer had good reason to think they wanted this policy in order to ensure good title before reselling the property.   For the same reasons, the purchasers' expectations failed the fourth *Gordinier* test, which applies if the insurer acted inconsistently with the exclusion.

¶37     We therefore reject the purchasers' reasonable expectations claim.  The "created" risk exclusion is enforceable, so First American properly denied coverage.

**V.**

¶38     Capital Title and First American have each requested attorney's fees.  We grant Capital Title's request pursuant to

17

A.R.S. § 12-341.01(A) (2003). Unlike Capital Title, which requested fees in its response to the petition for review, First American did not request fees until the supplemental brief. Arizona Rule of Civil Appellate Procedure 21(c)(1) requires fee requests to be made in the petition for review or the response to the petition. Accordingly, we reject First American's request as untimely. *See Powell v. Washburn*, 211 Ariz. 553, 560 ¶ 29, 125 P.3d 373, 380 (2006).

## CONCLUSION

¶39     For the foregoing reasons, we vacate the opinion of the court of appeals and affirm the judgment of the superior court.

_____
W. Scott Bales, Justice

CONCURRING:


_____
Ruth V. McGregor, Chief Justice


_____
Rebecca White Berch, Vice Chief Justice


_____
Michael D. Ryan, Justice


_____
Andrew D. Hurwitz, Justice